927 P.2d 355

**ELF ATOCHEM NORTH AMERICA, INC., a Pennsylvania corporation, Plaintiff–Appellee, Cross Appellant,**

v.

**CELCO, INC., an Arizona corporation formerly known as Sun Country Citrus, Inc.; Charles E. Lakin and Florence Lakin, husband and wife; William F. Kilzer and Diane L. Kilzer, husband and wife; Charles E. Lakin, III and Cynthia Lakin, husband and wife; G. Nemat–Gorgani and Deborah Nemat–Gorgani, husband and wife, Defendants–Appellants, Cross Appellees.**

No. 1 CA–CV 94–0037.

Court of Appeals of Arizona, Division 1, Department B.

March 26, 1996.

Reconsideration Granted April 29, 1996.

Review Denied Nov. 19, 1996.

Bryan Cave by Mark I. Harrison, Stephen M. Dichter, Phoenix, Margaret C. Nikolai, St. Louis, MO, for Plaintiff–Appellee/Cross Appellant.

McGrath, North, Mullin & Kratz, P.C. by Douglas E. Quinn, Omaha, NE, and Jaburg & Wilk, P.C., by Michael J. McGivern, Phoenix, for Defendants–Appellants/Cross Appellees.

## OPINION

EHRLICH, Judge.

Defendants–Appellants/Cross Appellees ("Celco") appeal from the trial court's partial summary judgment on the claims of Plaintiff–Appellee/Cross Appellant ("Elf Atochem") of liability for replevin and conversion of certain citrus-scanning, -sorting and -packing equipment which Elf Atochem both leased and conditionally sold to Amcico, a now-defunct Arizona corporation. Elf Atochem cross-appeals the court's determination that it suffered "zero" dollars in damages. We affirm the partial summary judgment regarding Celco's liability for replevin and conversion. However, we remand for further proceedings on the issue of damages.

### FACTS AND PROCEDURAL HISTORY

This case centers around a citrus-packing facility ("packinghouse") in Yuma which was built by Charles Lakin and Sun Country Citrus ("SCCI") sometime during 1972 and 1973. In 1985, the packinghouse was leased to Sunco Partners. The lease gave Sunco the right to replace existing packing, sizing and grading equipment with "state-of-the-art" equipment, and an option to purchase the packinghouse and all of the equipment outright.

On December 8, 1986, a number of transactions occurred which are critical to resolving this appeal. PKD, Inc. ("PKD") acquired Sunco's assets, including the lease and all rights under the lease, on the Lakin/SCCI facility. PKD concurrently exercised the purchase option under the lease, in consideration for which PKD provided a $2.5 million promissory note secured by a deed of trust on the packinghouse. The deed of trust provided that, in the event of default by PKD, Lakin/SCCI had the right to seek a trustee's sale of the real property and "all buildings, improvements and fixtures located thereon or hereinafter erected thereon."

In addition, the parties signed a "Bill of Sale" granting Lakin/SCCI "all of Sellers [sic] rights, title and interest in and to all personal property, including without limitation, packing equipment, boilers, compressors, fixtures, packinghouse related supplies ... owned by Seller and located at the packinghouse facility." The "Bill of Sale" was secured by a Uniform Commercial Code ("UCC") Form 1 Financing Statement

("UCC1"), executed by PKD as "debtor" and listing Lakin/SCCI as the "secured party" in "all personal property" at the packinghouse. Separately, PKD and Lakin/SCCI also signed an agreement whereby the latter was granted a "first position security interest in the personal property involved in the packinghouse to secure all obligations of PKD to Lakin except as to any valid liens coincident to installment purchases."

The final transaction of importance was the execution by Lakin and Charles E. Lakin, III, president and secretary respectively of SCCI, of an amendment to SCCI's articles of incorporation changing the company's name to Celco. It is undisputed, however, that the amendment was not filed with the Arizona Corporation Commission ("Commission") until March 18, 1987, and that none of the other documents executed on December 8, 1986, were amended or refiled to reflect the change.

Just over two months later, on February 20, 1987, PKD also changed its name to Amcico. While Amcico filed this change of name with the Commission on February 23, 1987, it did not record the change with the Yuma County Recorder until April 7, 1988.

During the spring and early summer of 1987, Amcico negotiated for the sale and lease of citrus-sorting equipment from the Pennwalt Corporation, now Elf Atochem.[1] The equipment sales were completed on July 7 and 13, 1987, and were memorialized in two conditional sales contracts numbered 2969 and 2970.

On the reverse of each of the conditional-sales contracts were identical printed terms and conditions containing the following relevant provisions:

1(a) Title to equipment shall remain in Seller until the entire purchase price is paid in full. Liability for any damage to equipment is assumed by Purchaser. Purchaser agrees upon the Seller's request to execute a financing statement or such other instrument as may be necessary or suitable to protect Seller's interest in the equipment. Purchaser agrees to keep the equipment free of all liens and encumbrances.

1(b) If any payment is not received when due, or if Purchaser shall default in the performance of any other obligation required hereunder, all unpaid installments shall become immediately due and payable and Seller shall have the rights and remedies of a secured party under the Uniform Commercial Code or other applicable law including, without limitation thereto, the right to sell, lease or otherwise dispose of any or all of the equipment and the right to take possession of the same and for that purpose the Seller may enter upon the premises on which the equipment or any part thereof may be situated, and remove the same therefrom. The Seller may require the Purchaser to assemble the equipment and make it available to the Seller at a place to be designated by it which is reasonably convenient to both parties....

In accordance with paragraph 1(a), Amcico, as purchaser/debtor, executed a UCC1 which Elf Atochem filed with the Arizona Secretary of State on July 15, 1987. The UCC1 described the secured collateral as "Equipment as described in Sales Orders # 2969 and # 2970." Copies of the sales contracts were not attached to the UCC1. Shortly thereafter, on July 25, 1987, Elf Atochem began delivery and installation of the equipment at the packinghouse.

In December 1987, Amcico defaulted on its payments under the conditional-sales contracts, as well as on its payments to Celco (then still Lakin/SCCI). On May 16, 1988, Elf Atochem informed Amcico that it would seek to repossess the equipment.

One week later, Celco filed a complaint against Amcico seeking a court-appointed receiver to take control of and manage the packinghouse pending the trustee's sale under the provisions of the deed of trust. The suit also requested that Celco be given a "first and valid lien" on personal property possessed by Amcico, including the equipment leased and sold by Elf Atochem. An agreement regarding the appointment of the receiver eventually was reached between

---

1. The transaction also included two software-licensing agreements for computer programs needed to run the leased equipment. These agreements are not at issue in this appeal.

Celco and Amcico. The stipulation was accepted by the superior court and reduced to an order on June 13, 1988.

Elf Atochem learned of the receiver's appointment on July 13, 1988, and promptly demanded, by letter of the same date sent to Celco's former counsel, the return of its equipment. When the equipment was not returned, Elf Atochem filed a complaint seeking compensatory and punitive damages for the replevin and conversion of its equipment, and further asking the superior court to enjoin the trustee's sale. Concurrently, Elf Atochem filed an "Application for Provisional Remedy with Notice of Replevin."

Preliminary negotiations between Elf Atochem and Celco eventually resulted in a "Stipulation Regarding Property." Presented to the trial court on September 14, 1988, the day before the scheduled trustee's sale, the stipulation, in pertinent part, provided that: (1) the parties disputed ownership of the conditionally-sold equipment; (2) the trustee's sale would proceed but Celco would inform any successful bidder on the disputed equipment that title to the equipment would be dependent on the court's ruling in Elf Atochem's underlying suit; (3) if Celco were the successful bidder, it would retain possession of the equipment until a final ruling in the replevin/conversion action; (4) Elf Atochem could "pick up the equipment leased to AMCICO, as the right to possession of the leased equipment is not at issue," and (5) the stipulation could not be considered a waiver by either party of their respective claims for damages. Celco was the only bidder on the disputed equipment at the sale.

Subsequently, on October 5, 1988, Celco answered Elf Atochem's complaint, contending that the deed of trust gave it a prior and superior security interest in the conditionally-sold equipment and denying that it was hampering Elf Atochem's attempts to retake its leased equipment.

The trial court held a hearing on Elf Atochem's provisional-remedy application. However, it delayed any ruling and stayed further proceedings until after the filing of an involuntary bankruptcy petition against Amcico. When Elf Atochem was granted relief from the bankruptcy stay, the court, on May 30, 1989, approved Elf Atochem's application and ordered the Yuma County Sheriff, upon the filing of a replevin bond, to take possession of the conditionally-sold equipment. After several cross-filings by the parties regarding the court's order, Elf Atochem was able to take possession of the conditionally-sold and the leased equipment during the period August 16 through September 6, 1989.

Three months later, on December 11, 1989, Elf Atochem filed a motion for partial summary judgment to determine Celco's liability for replevin and conversion of its equipment. The legal questions presented by the motion included whether the conditionally-sold equipment constituted fixtures or personal property and, depending on the character of the equipment, which party had priority under the UCC. Celco's response mirrored its arguments opposing the provisional-remedy application. As in that proceeding, Celco made a three-pronged claim: first, that the equipment constituted fixtures which were secured by Celco's timely "fixture filing" (the deed of trust) prior to Elf Atochem's UCC1 filing; second, that Elf Atochem's security interest was unperfected because copies of the sales contracts were not attached to its UCC1, while Celco's security interest was perfected either through proper filing or possession of the equipment; and third, that, even if both parties' security interests were unperfected, Celco should prevail because its security interest attached first.

On April 13, 1990, the trial court granted Elf Atochem partial summary judgment. In its minute entry, the court made the following findings of fact:

\* \* \* \* \* \*

2. That [Elf Atochem] sold certain equipment to AMCICO, Inc. (AMCICO) on or about July 7, 1987, under conditional installment sales contracts (contracts) which were numbered 2969 and 2970.

\* \* \* \* \* \*

4. That AMCICO formerly did business under the name of PKD, Inc. (PKD), having changed its name to "AMCICO, Inc." on or about February 20, 1987.

5. That recordation of the change of name with the Yuma County Recorder from PKD to AMCICO was on April 7, 1988.

\* \* \* \* \* \*

8. On December 8, 1986, SCCI gave PKD a bill of sale transferring SCCI's interest in the personalty and fixtures in the packing house, packing equipment being specifically included as personalty but which also listed fixtures as personal property and with authority in PKD to replace equipment as it saw fit.

\* \* \* \* \* \*

10. On December 11, 1986, the deed of trust and a UCC1 Financing Statement (UCC1), which excluded liens arising from installment purchases, from PKD to SCCI (rather than CELCO) was recorded in Yuma County.

11. On December 31, 1986, SCCI recorded the UCC1 in 10 above at the office of the Secretary of State.

12. [Celco] did not give public notice of the change of name of the debtor in the UCC1 or deed of trust from PKD to AMCICO.

13. [Elf Atochem] recorded a UCC1 on the July 7, 1987, equipment sale to AMCICO in the office of the Secretary of State on July 15, 1987.

14. The UCC1 in 13 above referenced the two conditional sales contract forms in 2 above, but copies thereof were not attached to the recorded UCC1.

\* \* \* \* \* \*

20. The equipment sold by [Elf Atochem] to AMCICO was equipment, and thus, personal property, rather than fixtures, as the equipment was intended to be personalty and could be removed without material injury to the property, not being substantially affixed to the property. Neither was this equipment so affixed as to become an integral part of the realty.

21. The supposed lien filings of each party are flawed. [Elf Atochem] failed to attach the contracts and ha[s] not given a detailed identification of the collateral and [Celco] did not file and amend in such a manner as to place [Elf Atochem] on notice that it claimed a lien. [Celco] never "filed" as relates to this transaction. [Elf Atochem's] filing was otherwise appropriate to give notice.

22. [Elf Atochem is] entitled to replevin the equipment as against the claim of [Celco].

Discovery continued over the course of the following months until Elf Atochem filed a complementary motion for partial summary judgment seeking damages for Celco's replevin and conversion of the conditionally-sold and leased equipment. With regard to the leased equipment, Elf Atochem contended that, because of unduly burdensome demands and other dilatory actions by Celco, recovery of the leased equipment was effectively thwarted until the conditionally-sold equipment was obtained in late-August/early-September 1989. Based on a combined monthly rental value of $25,000, a minimum 13–month wrongful detention period, and $21,946.07 in recapture costs, Elf Atochem requested $346,946.07 in damages. Alternatively, and in the event that the trial court did not accept the "rental-value" theory of damages, Elf Atochem argued for $167,-379.36 in damages, representing the loss of interest over the same period plus the same cost of recapture. The interest was calculated on the total value of the leased and conditionally-sold equipment at the time of the wrongful detention, $1,342,461.14, at the statutory 10 percent annual rate of interest, and over the same 13–month detention period ($145,433.29).

Celco filed two responsive pleadings. The first was a motion to amend its original answer to add a two-count counterclaim for the excess, or "windfall," Elf Atochem received when it repossessed its equipment. Celco calculated the alleged "windfall" of over $1 million by subtracting the amount Amcico owed on the sales contracts, nearly $300,000, from the total value of the leased and conditionally-sold equipment at the time of detention, $1,342,461.14. Celco asserted that, pursuant to Ariz.Rev.Stat.Ann. ("A.R.S.") section 47–9507(B), it was entitled, as a secured creditor, to payment from the excess proceeds stemming from a "commercially rea-

**94**

sonable" sale of the equipment by Elf Atochem.

The second pleading was a combined answer to the motion for partial summary judgment regarding damages and a motion to reconsider the summary judgment on the question of Celco's liability for conversion. Celco's answer paralleled the "windfall" argument set forth in its motion to amend, while the reconsideration motion urged that, because the court-appointed receiver had actual possession of the equipment when Elf Atochem made its July–1988 demand on Celco, and because the demand was not renewed when Celco took possession after the trustee's sale on September 15, 1988, or after the receivership was ended in November, 1988, there was no basis for maintaining the conversion claim.

On November 12, 1992, pursuant to a stipulation by the parties, the trial court entered an order setting the briefing schedule for Elf Atochem's response to Celco's Motion to Amend Answer and Add Counterclaim, Celco's reply and the date for oral argument. The order further permitted Elf Atochem to delay filing its reply to Celco's response to the motion for partial summary judgment for up to ten days after the court issued its ruling on Celco's motion.

When Elf Atochem filed its response, it proffered several reasons for denying Celco's motion, including (1) Celco's lack of any security interest in the conditionally-sold equipment upon which to base its counterclaim, (2) the untimeliness of the counterclaim, (3) the absence of any "windfall" to Elf Atochem because Amcico still owed $243,758.63 on the conditional sales contracts, while the resale of some of the repossessed equipment had only netted $48,094, and the remaining equipment retaining a salvage value of only $40,-000 [2] and (4) the minimal factual nexus between Elf Atochem's conversion-damages* claim and Celco's. Contemporaneously, Elf Atochem asked the trial court to rule on Celco's motion for reconsideration before requiring Elf Atochem to file its partial-summary-judgment reply and, further, to clarify whether its order granting Elf Atochem partial summary judgment on the liability issues included liability for replevin and conversion of the leased equipment.

On January 14, 1993, after a hearing, the trial court denied Celco's motion, ruling that Celco lacked any security interest in the equipment and that its counterclaim was untimely. However, despite its November 12, 1992, order, the court also denied Elf Atochem's motion for partial summary judgment, agreeing that Celco should be allowed to question the "commercial reasonableness" of Elf Atochem's resale of some of the conditionally-sold equipment.

Elf Atochem then moved the trial court for a *nunc pro tunc* order correcting its January 14, 1993, order to acknowledge the provisions of the November 12, 1992, order permitting Elf Atochem to file its reply to the partial summary judgment motion. Elf Atochem stated that, if allowed to file a reply, it would argue that Amcico, not Celco, had standing to assert a "commercial-reasonableness" challenge. Alternatively, Elf Atochem requested the court to reconsider its order. On January 21, 1993, the court amended the order and reaffirmed its November order.

Elf Atochem's partial-summary-judgment reply was filed on February 10, 1993. One week later, the trial court denied Elf Atochem's motion. However, Elf Atochem was prompted to move for reconsideration, specifically, reconsideration of the decision to award no damages with respect to either the "leased" equipment or for the time between the filing of the involuntary bankruptcy petition, December 1, 1989, and the date when the bankruptcy stay was lifted, May 5, 1990.

After a subsequent order was filed on March 19, 1993, the parties agreed to a stipulated judgment whereby they would forego the damages trial and bring all contested issues before this court. On October 26, 1993, pursuant to the stipulation, the trial court (1) granted judgment to Elf Atochem on its claims of replevin and conversion; (2) assessed damages for the periods June 13,

**2.** Elf Atochem also stated that these figures did not reflect $69,000 in late charges, the recapture costs themselves, nor the interest due on the unpaid balance at the contract rate of two percent per month.

1988, until November 30, 1988 (as to the conditionally-sold equipment alone), and from July 13, 1988, until September 14, 1988, in the amount of "zero" dollars; (3) denied damages, under either theory proposed by Elf Atochem, for any other time periods; (4) denied the claim for punitive damages; (5) dismissed as moot the count of Elf Atochem's complaint requesting injunctive relief; (6) denied Celco's motion to amend and add counterclaim and (7) denied attorneys' fees to all parties. The parties timely appealed and cross-appealed.

## DISCUSSION

On appeal, Celco challenges the trial court's partial summary judgment in favor of Elf Atochem on its claims of liability for replevin and conversion of the citrus-scanning, -sorting and -packaging equipment. On cross-appeal, Elf Atochem challenges the determination that it suffered "zero" dollars in damages.

### A. Celco's Appeal

 In challenging its liability for replevin and conversion of Elf Atochem's equipment, Celco argues that the trial court erred in its underlying determination that Celco had neither a security interest nor any other UCC-recognized priority in the disputed equipment. Celco's argument is three-pronged, the first two of which refuting the finding that Celco lacked a security interest in the equipment and the third contending that, assuming the unperfected status of both Celco's and Elf Atochem's security interests, Celco's interest has priority over Elf Atochem's because it attached first. Because we find that Elf Atochem's security interest was perfected, we need not address the last issue. Moreover, because we find that Elf Atochem had a perfected purchase money security interest ("PMSI"), we can summarily dispose of the first two contentions.

3. The Arizona version of the UCC, A.R.S. section 47–1101 et seq., was adopted in 1967. See 1967 Sess.Laws, ch. 3, effective after December 31, 1967, and unified and renumbered as Title 47 by

### 1. Relevant UCC Provisions [3]

The purposes of the UCC are quite clear and are listed in A.R.S. section 47–1102:

A. This title shall be liberally construed and applied to promote its underlying purposes and policies.

B. Underlying purposes and policies of this title are:

1. To simplify, clarify, and modernize the law governing commercial transactions.

2. To permit the continued expansion of commercial practices through custom, usage and agreement of the parties.

3. To make uniform the law among the various jurisdictions.

Provisions dealing with the creation, attachment, perfection and priority of security interests are found in Chapter 9. See A.R.S. § 47–9101 et seq. The purpose of the chapter is set forth in section 47–9102 which, in relevant part, states:

A. Except as otherwise provided in § 47–9104 [excluded transactions], this chapter applies:

1. To any transaction (regardless of its form) which is intended to create a security interest in personal property or fixtures including goods, documents, instruments, general intangibles, chattel paper or accounts. . . .

\* \* \* \* \* \*

B. This chapter applies to security interests created by contract including pledge, assignment, chattel mortgage, chattel trust, trust deed, factor's lien, equipment trust, conditional sale, trust receipt, other lien or title retention contract and lease or consignment intended as security. . . .

Attachment and perfection of security interests are dealt with in sections 47–9203 and 47–9303, respectively. Section 47–9203 sets forth three prerequisites for attachment:

A. Subject to the provisions of § 47–4208 on the security interest of a collecting bank and § 47–9113 on a security interest arising under the chapter on sales, a security

1984 Sess.Laws, ch. 77, effective August 3, 1984. Throughout this opinion, UCC references will be to the A.R.S. section numbers.

interest is not enforceable against the debtor or third parties with respect to the collateral and does not attach unless:

1. The collateral is in the possession of the secured party pursuant to agreement, *or the debtor has signed a security agreement which contains a description of the collateral* ...; and

2. *Value has been given;* and

3. *The debtor has rights in the collateral.*

(Emphasis added.)

Pursuant to section 47–9303(A):

A security interest is perfected when it has attached and when all of the applicable steps required for perfection have been taken. Such steps are specified in §§ 47–9302, 47–9304, 47–9305 and 47–9306. If such steps are taken before the security interest attaches, it is perfected at the time when it attaches.

Involved in this case are the perfecting "steps" enumerated in sections 47–9302 and 47–9305. Respectively, and in relevant part, the sections provide:

A. A financing statement [UCC1] must be filed to perfect all security interests except the following:

1. A security interest in collateral in possession of the secured party under § 47–9305.

and

A security interest in letters of credit and advices of credit (paragraph 1, subsection B of § 47–5116), *goods,* instruments, money, negotiable documents or chattel paper may be perfected by the secured party's taking possession of the collateral. If such collateral other than goods covered by a negotiable document is held by a bailee, the secured party is deemed to have possession from the time the bailee receives notification of the secured party's interest. A security interest is perfected by possession from the time possession is taken without relation back and continues only so long as possession is retained, unless otherwise specified in this chapter. The security interest may be otherwise perfected as provided in this chapter be-fore or after the period of possession by the secured party.

Chapter 9 also defines several essential terms. First, in section 47–9105(A), one learns that:

4. "Collateral" means the property subject to a security interest, and includes accounts and chattel paper which have been sold.

\* \* \* \* \* \*

10. "Goods" includes all things which are movable at the time the security interest attaches or which are fixtures (§ 47–9313), but does not include money, documents, instruments, accounts, chattel paper, general intangibles, or minerals or the like (including oil and gas) before extraction....

\* \* \* \* \* \*

14. "Security Agreement" means an agreement which creates or provides for a security interest.

Next, section 47–9107 defines a "purchase money security interest," in part, as one that is "[t]aken or retained by the seller of the collateral to secure all or part of its price." Finally, section 47–9109 defines "goods" as including:

2. "Equipment" if they are used or bought for use primarily in business (including farming or a profession) or by a debtor who is a non-profit organization or a governmental subdivision or agency or if the goods are not included in the definitions of inventory, farm products or consumer goods.

A final important definition, though not found in Chapter 9, is that of a "security interest," which means "an interest in personal property or fixtures which secures payment or performance of an obligation." A.R.S. § 47–1201(37).

*2. Interests Involved in the Disputed Equipment*

Celco asserts a perfected security interest in the equipment at the packinghouse based, first, on its UCC1 filing with the Secretary of State on December 31, 1986, and, second, its possession of the equipment, pursuant to

A.R.S. section 47–9305, either on the date the court-appointed receiver took possession, June 13, 1988, or the date the receivership was closed and the equipment was transferred to Celco, November 21, 1988. Although neither contention is meritorious, we assume, for the sake of argument, that Celco's interest was perfected. We do so because we find controlling Elf Atochem's claim that, even if Celco's security interest is perfected, its security interest must prevail because it is a perfected PMSI.

Elf Atochem's argument is premised on A.R.S. section 47–9312(C) which states:

C. A purchase money security in collateral other than inventory has priority over a conflicting security interest in the same collateral or its proceeds if the purchase money security interest is perfected at the time the debtor receives possession of the collateral or within twenty days thereafter.

The record clearly indicates that Elf Atochem intended the conditional-sale contracts to create a security interest designed "to secure all or part of" the purchase of the equipment, and that Elf Atochem perfected its PMSI when it filed its UCC1 with the Secretary of State on July 15, 1987, ten days prior to delivery and installation of the equipment at the packinghouse.[4] Elf Atochem's security interest prevails over that of Celco.

Celco counters that Elf Atochem's security interest, PMSI or otherwise, was unperfected because Elf Atochem failed to attach copies of the two conditional-sale contracts to its UCC1. It argues that, accordingly, its "description" of the collateral under section 47–9402(A) was invalid. We disagree.

Section 47–9402(A) establishes the formal requisites of a financing statement and pertinently provides:

A financing statement is sufficient if it gives the names of the debtor and the secured party, is signed by the debtor, gives an address of the secured party from which information concerning the security interest may be obtained, gives a mailing address of the debtor and *contains a state-*

*ment indicating the types, or describing the items, of collateral.* [Emphasis added.]

The official comment to section 47–9402 instructs that:

2. This section adopts the system of "notice filing" which proved successful under the Uniform Trust Receipts Act. What is required to be filed is not, as under chattel mortgage and conditional sales acts, the security agreement itself, but only a simple notice which may be filed before the security interest attaches or thereafter. *The notice itself indicates merely that the secured party who has filed may have a security interest in collateral described. Further inquiry from the parties concerned will be necessary to disclose the complete state of affairs.* [Emphasis added.]

UCC § 9–402 Comment 2.

Section 47–9110 establishes that a sufficient description of personal property under Chapter 9 is one that "reasonably identifies what is described." The official comment to that section notes that "[t]he test of sufficiency of a description laid down by this section is that the description do the job assigned to it—that it make possible the identification of the thing described." UCC § 9–110 Comment.

The description of collateral on Elf Atochem's UCC1—"Equipment as described on Sales Orders # 2969 and # 2970"—satisfies both sections. As noted above, the UCC expressly defines "equipment" as a subcategory of "goods," *see* section 47–9109(2), and, thus, as a "type" of collateral. Moreover, the description, by referring an inquiring party to two specific sales orders, "make[s] possible the identification of" the equipment. Elf Atochem's UCC1 complied with the requirements of section 47–9402 and 47–9110.

Elf Atochem's failure to attach copies of the sales orders to its UCC1 does not alter our conclusion. We are persuaded by the reasoning in *Lloyds Credit Corp. v. McClain Heller Ins., Inc.,* 262 N.J.Super. 211, 620 A.2d 472 (Law Div.1992), and *In re Wak,*

---

**4.** It is undisputed that Elf Atochem's security interest attached under section 47–9203(A). Amcico signed the sales contracts, which constituted

security agreements, *see* section 47–9105(14); value was given (the equipment) and Amcico had possessory rights in the equipment.

*Ltd., Inc.,* 147 B.R. 607 (S.D.Fla.1992), that, in essence, where the UCC1 denotes a "type" or "item" of collateral and directs an inquiring party to another document which has an existence, as well as legal and contractual significance, separate and apart from the UCC1 filing, the filing party has satisfied the mandates of sections 47–9402 and 47–9110. In *Lloyds,* the other document was the security agreement itself, while a specific lease provided the satisfying documentation in *Wak.* By providing the type of collateral, "equipment," and citing the two independent conditional-sale contracts, Elf Atochem provided a sufficient description of the collateral in its UCC1.

The cases upon which Celco relies are all factually distinguishable, either because the omitted document had no legal significance separate from the UCC1 filing or because the UCC1 description was otherwise inadequate. For example, in *Matter of Waldick Aero–Space Devices, Inc.,* 49 B.R. 192 (D.N.J.1985), *rev'd on other grounds,* 71 B.R. 932 (D.N.J.1987), and *In re Antekeier,* 6 U.C.C. (Callaghan) 1027 (Bankr.W.D.Mich. Sept. 3, 1969), the disputed UCC1s contained no independent descriptions of the types or items of collateral and referred solely to "attached" documents which were not, in fact, attached. In *Waldick,* the UCC1 described the collateral simply as "Per the attached Schedule 'A' to be made part hereof," whereas in *Antekeier,* the description consisted merely of the sentence "See Attached Description of Property." The courts in both cases rejected the descriptions as violative of UCC sections 9–110 and 9–402. *Waldick,* 49 B.R. at 196; *Antekeier,* 6 U.C.C. at 1030. Certainly, the UCC's directive that its provisions be "liberally construed and applied to promote its underlying purposes and policies," *see* section 47–1102(A), does not, as the court in *Antekeier* noted, "require that the courts disregard its specific requirements."

We concur with the decisions in *Waldick* and *Antekeier,* and believe that Elf Atochem's UCC1 description would have been approved by both courts. Indeed, had the disputed UCC1s in *Waldick* and *Antekeier* contained descriptions similar to Elf Atochem's, quite different conclusions might well

have been reached. *See Antekeier,* 6 U.C.C. at 1030 ("It is noted that the description in the filed financing statement did not state '*equipment* per attached description' but merely stated 'See attached description of property.'") (emphasis original).

Celco also relies on *Chase Manhattan Bank, N.A. v. J & L General Contractors, Inc.,* 832 S.W.2d 204 (Tex.Ct.App.1992). There, "[a]ll fixed assets including all equipment and fixtures listed" was provided as the description of collateral on the UCC1. We agree with Elf Atochem that, not only does the case provide little, if any, support for Celco, it actually confirms the adequacy of Elf Atochem's UCC1 description.

As an initial matter, the description in *Chase Manhattan* resembles that of Elf Atochem in that it denotes a UCC-recognized "type" of collateral. However, it differs in two important respects: its use of the term "listed" and, by use of that term, its reference to a document that has no legal significance beyond the financing statement. The importance of these dissimilarities is highlighted by the discussion in *Chase Manhattan* of *In re Tebbs Constr. Co., Inc.,* 39 B.R. 742 (E.D.Va.1984). In *Tebbs,* a challenge to a financing statement that identified the collateral as "[a]ccounts receivable, inventory, and those items of machinery and equipment, with replacements thereof, as set forth in the attached security agreement," but did not include the security agreement, was rejected by the bankruptcy court which concluded, as paraphrased by the court in *Chase Manhattan,* that:

> ... creditor "A's" failure to further describe the collateral by attaching the security agreement did not render the financing statement deficient, as the financing statement complied with Section 9.402 requirements by identifying the collateral by type.

832 S.W.2d at 210. Distinguishing *Tebbs* from the case before it, the *Chase Manhattan* court explained, "the item that was not attached to the financing statement in *Tebbs,* the security agreement, was a tangible item that did exist, while in the instant case, no

such 'list' was made, and no reference was made to a security agreement."

This case presents a circumstance much closer to *Tebbs* and, per the *Chase Manhattan* court's reasoning, quite different from that in *Chase Manhattan*. Like the security agreement in *Tebbs*, and unlike the inferred "list" in *Chase Manhattan*, Sales Orders # 2969 and # 2970 are "tangible" and do exist separate and apart from Elf Atochem's UCC1. Inquiring parties are clearly put on notice that the equipment listed in the sales orders could be subject to a security interest and that further inquiry is warranted.

Finally, Celco's reliance on *Matter of H.L. Bennett Co.*, 588 F.2d 389 (3d Cir.1978), a case of very narrow scope, is also misplaced. Ruling that a financing statement describing collateral as "[a]ll assets as contained in the security agreement (installment note) executed even date herewith" was insufficient under the Pennsylvania version of UCC section 9–402, the Third Circuit announced:

> Indication by "type", on the other hand, implies a more general mode of identifying collateral. The Bank contends that the broad categories of personal property used in Article 9 of the UCC, such as "consumer goods," "equipment," "farm products," and "inventory," UCC § 9–109 ... constitute "types" of collateral within the meaning of section 9–402(1). We note that there is a controversy as to whether even these categories of property satisfy the statutory requirement of identification by "types"; we need not settle that controversy to reach a decision in this case. We do hold, however, that a financing statement ... which lists collateral *less* specifically than by reference to the categories of personal property contained in Article 9 does not comply with the statutory imperative of identification by "types."

*Id.* at 392 (emphasis original; footnote omitted).

The use of the term "equipment" by Elf Atochem was an accepted identification of collateral by UCC-recognized "type." *Matter of H.L. Bennett Co.* provides no support for Celco's attack upon the sufficiency of Elf Atochem's financing statement.[5]

### B. Elf Atochem's Cross–Appeal

■ Elf Atochem challenges the trial court's damages judgment, entered pursuant to a stipulation of parties and filed on October 26, 1993, that it suffered "zero" dollars in damages for the conversion of the conditionally-sold and leased equipment. More particularly, the judgment established the period of damages from June 13, 1988, until November 30, 1988 for the conditionally-sold equipment and from July 13, 1988, until September 14, 1988, for the leased equipment. The court also excluded from damages the period that the automatic bankruptcy stay was in effect, December 1, 1988, until May 4, 1989.

We are most concerned by the latter determination, exclusion of damages during the bankruptcy period. For example, while the parties' arguments all but admit that the disputed equipment was subject to the automatic stay imposed by the bankruptcy court, *see* 11 U.S.C. § 362(a), it is not at all clear whether the equipment was, pursuant to 11 U.S.C. § 541(a), part of Amcico's bankruptcy "estate," and, thus, even subject to the automatic stay. For example, if the stipulation reached between Elf Atochem and Celco regarding the trustee's sale resulted in a transfer of ownership that left Amcico without any legal or equitable interest in the equipment, *see* § 541(a)(1), then the automatic stay would not have applied to the proceedings in this case. *See United States v. Whiting Pools, Inc.*, 462 U.S. 198, 209, 103 S.Ct. 2309, 2315, 76 L.Ed.2d 515 (1983); *In re Contractors Equip. Supply Co.*, 861 F.2d 241, 244 (9th Cir.1988). As the record does not reveal whether the court addressed these or related issues, and because such information might

---

**5.** The remaining cases cited by Celco are also distinguishable: *In re Softalk Publishing Co., Inc.*, 856 F.2d 1328, 1331 (9th Cir.1988) ("financing statement that contains no description of collateral at all is insufficient to perfect"); *In re 199Z, Inc.*, 137 B.R. 778, 784 (C.D.Cal.1992) (attachment to UCC1 failed to describe the collateral of the debtor to the security agreement); *In re Campbell Sixty Six Express, Inc.*, 73 B.R. 601 (W.D.Mo.1987) (reference to non-existent attachment in security agreement rendered description insufficient under UCC section 9–203 [*see* A.R.S. section 47–9203], and broader description in financing statement unable to cure deficiency).

well have affected its ruling regarding damages, we believe the most prudent course of action to be to remand for further proceedings on the issue of damages.

## CONCLUSION

The trial court's partial summary judgment regarding the actions for replevin and conversion is affirmed. The matter is remanded for further proceedings regarding the calculation of damages.

THOMPSON, P.J., and KLEINSCHMIDT, J., concur.